**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-4138

———

J.S., a minor, through her parents;
TERRY SNYDER;
STEVEN SNYDER,

Appellants

v.

BLUE MOUNTAIN SCHOOL DISTRICT;
JOYCE ROMBERGER; JAMES McGONIGLE

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 07-cv-00585)
District Judge:  Honorable James M. Munley

———

Argued June 2, 2009
Argued En Banc June 3, 2010

Before: McKEE, Chief Judge, SLOVITER, SCIRICA,
RENDELL,BARRY, AMBRO, FUENTES, SMITH, FISHER,
CHAGARES, JORDAN, HARDIMAN, GREENAWAY, JR.,
and VANASKIE, Circuit Judges.

(Filed: June 13, 2011)

Mary E. Kohart
Aliceson K. Littman
Tara S. Sarosiek
Drinker, Biddle & Reath
18th & Cherry Streets

One Logan Square
Philadelphia, PA 19103

Mary Catherine Roper
American Civil Liberties Union
of Pennsylvania
P.O. Box 40008
Philadelphia, PA  19106

Witold J. Walczak (Argued)
American Civil Liberties Union
313 Atwood Street
Pittsburgh, PA  15213
        *Attorneys for Appellants*

Jonathan P. Riba (Argued)
Sweet, Stevens, Katz & Williams
331 East Butler Avenue
P.O. Box 5069
New Britain, PA  18901
        *Attorney for Appellees*

_____

OPINION OF THE COURT
_____


CHAGARES, <u>Circuit Judge</u>, with whom McKEE, <u>Chief Judge</u>, SLOVITER, AMBRO, FUENTES, SMITH, HARDIMAN, and GREENAWAY, JR., <u>Circuit Judges</u>, join.


J.S., a minor, by and through her parents, Terry Snyder and Steven Snyder, individually and on behalf of their daughter, appeal the District Court's grant of summary judgment in favor of the Blue Mountain School District ("the School District") and denial of their motion for summary judgment. This case arose when the School District suspended J.S. for creating, on a weekend and on her home computer, a MySpace profile (the "profile") making fun

of her middle school principal, James McGonigle. The profile contained adult language and sexually explicit content. J.S. and her parents sued the School District under 42 U.S.C. § 1983 and state law, alleging that the suspension violated J.S.'s First Amendment free speech rights, that the School District's policies were unconstitutionally overbroad and vague, that the School District violated the Snyders' Fourteenth Amendment substantive due process rights to raise their child, and that the School District acted outside of its authority in punishing J.S. for out-of-school speech.

Because J.S. was suspended from school for speech that indisputably caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school, the School District's actions violated J.S.'s First Amendment free speech rights. We will accordingly reverse and remand that aspect of the District Court's judgment. However, we will affirm the District Court's judgment that the School District's policies were not overbroad or void-for-vagueness, and that the School District did not violate the Snyders' Fourteenth Amendment substantive due process rights.

I.

J.S. was an Honor Roll eighth grade student who had never been disciplined in school until December 2006 and February 2007, when she was twice disciplined for dress code violations by McGonigle. On Sunday, March 18, 2007, J.S. and her friend K.L., another eighth grade student at Blue Mountain Middle School, created a fake profile of McGonigle, which they posted on MySpace, a social networking website. The profile was created at J.S.'s home, on a computer belonging to J.S.'s parents.

The profile did not identify McGonigle by name, school, or location, though it did contain his official photograph from the School District's website. The profile was presented as a self-portrayal of a bisexual Alabama middle school principal named "M-Hoe." The profile contained crude content and vulgar language, ranging from nonsense and juvenile humor to profanity and shameful personal attacks aimed at the principal and his

3

family. For instance, the profile lists M-Hoe's general interests as: "detention, being a tight ass, riding the fraintrain, spending time with my child (who looks like a gorilla), baseball, my golden pen, fucking in my office, hitting on students and their parents." Appendix ("App.") 38. In addition, the profile stated in the "About me" section:

> HELLO CHILDREN[.] yes. it's your oh so wonderful, hairy, expressionless, sex addict, fagass, put on this world with a small dick PRINCIPAL[.] I have come to myspace so i can pervert the minds of other principal's [sic] to be just like me. I know, I know, you're all thrilled[.] Another reason I came to myspace is because - I am keeping an eye on you students (who[m] I care for so much)[.] For those who want to be my friend, and aren't in my school[,] I love children, sex (any kind), dogs, long walks on the beach, tv, being a dick head, and last but not least my darling wife who looks like a man (who satisfies my needs ) MY FRAINTRAIN. . . .

Id. Though disturbing, the record indicates that the profile was so outrageous that no one took its content seriously. J.S. testified that she intended the profile to be a joke between herself and her friends. At her deposition, she testified that she created the profile because she thought it was "comical" insofar as it was so "outrageous." App. 190.

Initially, the profile could be viewed in full by anyone who knew the URL (or address) or who otherwise found the profile by searching MySpace for a term it contained. The following day, however, J.S. made the profile "private" after several students approached her at school, generally to say that they thought the profile was funny. App. 194. By making the profile "private," J.S. limited access to the profile to people whom she and K.L. invited to be a MySpace "friend." J.S. and K.L. granted "friend" status to about twenty-two School District students.

The School District's computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from

school. McGonigle first learned about the profile on Tuesday, March 20, 2007, from a student who was in his office to discuss an unrelated incident. McGonigle asked this student to attempt to find out who had created the profile. He also attempted – unsuccessfully – to find the profile himself, even contacting MySpace directly.

At the end of the school day on Tuesday, the student who initially told McGonigle about the profile reported to him that it had been created by J.S. McGonigle asked this student to bring him a printout of the profile to school the next day, which she did. It is undisputed that the only printout of the profile that was ever brought to school was one brought at McGonigle's specific request.

On Wednesday, March 21, 2007, McGonigle showed the profile to Superintendent Joyce Romberger and the Director of Technology, Susan Schneider-Morgan. The three met for about fifteen minutes to discuss the profile. McGonigle also showed the profile to two guidance counselors, Michelle Guers and Debra Frain (McGonigle's wife). McGonigle contacted MySpace to attempt to discover what computer had been used to create the profile, but MySpace refused to release that information without a court order. The School District points to no evidence that anyone ever suspected the information in the profile to be true.

McGonigle ultimately decided that the creation of the profile was a Level Four Infraction under the Disciplinary Code of Blue Mountain Middle School, Student-Parent Handbook, App. 65-66, as a false accusation about a staff member of the school and a "copyright" violation of the computer use policy, for using McGonigle's photograph. At his deposition, however, McGonigle admitted that he believed the students "weren't accusing me. They were pretending they were me." App. 327.[1]

_____

[1]In addition, Romberger testified as to her knowledge that it was actually K.L. and not J.S. who appropriated McGonigle's photograph from the School District's website. App. 305-06. Further, it was not until March 29, 2007 that the School District placed a warning on its website prohibiting the duplication of

5

J.S. was absent from school on Wednesday, the day McGonigle obtained a copy of the profile. When she returned, on Thursday, March 22, 2007, McGonigle summoned J.S. and K.L. to his office to meet with him and Guidance Counselor Guers. J.S. initially denied creating the profile, but then admitted her role. McGonigle told J.S. and K.L. that he was upset and angry, and threatened the children and their families with legal action. App. 333-34. Following this meeting, J.S. and K.L. remained in McGonigle's office while he contacted their parents and waited for them to come to school.

McGonigle met with J.S. and her mother Terry Snyder and showed Mrs. Snyder the profile. He told the children's parents that J.S. and K.L. would receive ten days out-of-school suspension, which also prohibited attendance at school dances. McGonigle also threatened legal action. J.S. and her mother both apologized to McGonigle, and J.S. subsequently wrote a letter of apology to McGonigle and his wife.

McGonigle next contacted MySpace, provided the URL for the profile and requested its removal, which was done. McGonigle also contacted Superintendent Romberger to inform her of his decision regarding J.S. and K.L.'s punishment. Although Romberger could have overruled McGonigle's decision, she agreed with the punishment. On Friday, March 23, 2007, McGonigle sent J.S.'s parents a disciplinary notice, which stated that J.S. had been suspended for ten days.[2] The following week, Romberger declined Mrs. Snyder's request to overrule the suspension.

On the same day McGonigle met with J.S. and her mother, he contacted the local police and asked about the possibility of pressing criminal charges against the students. The local police referred McGonigle to the state police, who informed him that he could press harassment charges, but that the charges would likely

photographs or other content from the website. See App. 79, 180.

[2]McGonigle testified that the other times he imposed a ten-day suspension were when students brought to school a knife, razor, alcohol, and marijuana. App. 317.

be dropped. McGonigle chose not to press charges. An officer did, however, complete a formal report and asked McGonigle whether he wanted the state police to call the students and their parents to the police station to let them know how serious the situation was. McGonigle asked the officer to do this, and on Friday, March 23, J.S. and K.L. and their mothers were summoned to the state police station to discuss the profile.

The School District asserted that the profile disrupted school in the following ways. There were general "rumblings" in the school regarding the profile. More specifically, on Tuesday, March 20, McGonigle was approached by two teachers who informed him that students were discussing the profile in class. App. 322. Randy Nunemacher, a Middle School math teacher, experienced a disruption in his class when six or seven students were talking and discussing the profile; Nunemacher had to tell the students to stop talking three times, and raised his voice on the third occasion. App. 368-73. The exchange lasted about five or six minutes. App. 371. Nunemacher also testified that he heard two students talking about the profile in his class on another day, but they stopped when he told them to get back to work. App. 373-74. Nunemacher admitted that the talking in class was not a unique incident and that he had to tell his students to stop talking about various topics about once a week. Another teacher, Angela Werner, testified that she was approached by a group of eighth grade girls at the end of her Skills for Adolescents course to report the profile. App. 415-16. Werner said this did not disrupt her class because the girls spoke with her during the portion of the class when students were permitted to work independently. App. 417-18.

The School District also alleged disruption to Counselor Frain's job activities. Frain canceled a small number of student counseling appointments to supervise student testing on the morning that McGonigle met with J.S., K.L., and their parents. Counselor Guers was originally scheduled to supervise the student testing, but was asked by McGonigle to sit in on the meetings, so Frain filled in for Guers. This substitution lasted about twenty-five to thirty minutes. There is no evidence that Frain was unable to reschedule the canceled student appointments, and the students who were to meet with her remained in their regular classes. App.

7

352-53.

On March 28, 2007, J.S. and her parents filed this action against the School District, Superintendent Romberger, and Principal McGonigle. By way of stipulation, on January 7, 2008, all claims against Romberger and McGonigle were dismissed, and only the School District remained as a defendant. After discovery, both parties moved for summary judgment.

After analyzing the above facts, the District Court granted the School District's summary judgment motion on all claims, though specifically acknowledging that Tinker v. Des Moines Independent Community School District, 393 U.S. 503 (1969), does not govern this case because no "substantial and material disruption" occurred. App. 10-12 (refusing to rely on Tinker); App. 17 (concluding that "a substantial disruption so as to fall under Tinker did not occur"). Instead, the District Court drew a distinction between political speech at issue in Tinker, and "vulgar and offensive" speech at issue in a subsequent school speech case, Bethel School District v. Fraser, 478 U.S. 675 (1986). App. 11-12. The District Court also noted the Supreme Court's most recent school speech decision, Morse v. Frederick, 551 U.S. 393 (2007), where the Court allowed a school district to prohibit a banner promoting illegal drug use at a school-sponsored event.

Applying a variation of the Fraser and Morse standard, the District Court held that "as vulgar, lewd, and potentially illegal speech that had an effect on campus, we find that the school did not violate the plaintiff's rights in punishing her for it even though it arguably did not cause a substantial disruption of the school." App. 15-16. The Court asserted that the facts of this case established a connection between off-campus action and on-campus effect, and thus justified punishment, because: (1) the website was about the school's principal; (2) the intended audience was the student body; (3) a paper copy was brought into the school and the website was discussed in school; (4) the picture on the profile was appropriated from the School District's website; (5) J.S. created the profile out of anger at the principal for disciplining her for dress code violations in the past; (6) J.S. lied in school to the principal about creating the profile; (7) "although a substantial disruption so as to

8

fall under <u>Tinker</u> did not occur . . . there was in fact some disruption during school hours"; and (8) the profile was viewed at least by the principal at school. App. 17 (emphasis added).

The District Court then rejected several other district court decisions where the courts did not allow schools to punish speech that occurred off campus, including the decision in <u>Layshock v. Hermitage School District</u>, 496 F. Supp. 2d 587 (W.D. Pa. 2007), a case substantially similar to the one before us, and which is also being considered by this Court. <u>See</u> App. 18-20. In distinguishing these cases, the District Court made several qualitative judgments about the speech involved in each. <u>See, e.g.</u>, App. 18 (asserting that the statements in <u>Flaherty v. Keystone Oaks School District</u>, 247 F. Supp. 2d 698 (W.D. Pa. 2003), were "rather innocuous compared to the offensive and vulgar statements made by J.S. in the present case"); App. 19 (contending that "[t]he speech in the instant case . . . is distinguishable" from the speech in <u>Killion v. Franklin Regional School District</u>, 136 F. Supp. 2d 446 (W.D. Pa. 2001), because of, <u>inter alia</u>, "the level of vulgarity that was present" in the instant case); App. 20 (claiming that, as compared to <u>Layshock</u>, "the facts of our case include a much more vulgar and offensive profile").

Ultimately, the District Court held that although J.S.'s profile did not cause a "substantial and material" disruption under <u>Tinker</u>, the School District's punishment was constitutionally permissible because the profile was "vulgar and offensive" under <u>Fraser</u> and J.S.'s off-campus conduct had an "effect" at the school. In a footnote, the District Court also noted that "the protections provided under <u>Tinker</u> do not apply to speech that invades the rights of others." App. 16 n.4 (citing <u>Tinker</u>, 393 U.S. at 513).

Next, the District Court held that the School District's policies were not vague and overbroad. The District Court first approached the issue in a somewhat backwards manner: it concluded that because the punishment was appropriate under the First Amendment, the policies were not vague and overbroad even though they can be read to apply to off-campus conduct. App. 21. Alternatively, the District Court held that the policy language was "sufficiently narrow . . . to confine the policy to school grounds and

9

school-related activities." Id. (quoting the Handbook, which provides that the "[m]aintenance of order applies during those times when students are under the direct control and supervision of school district officials," and noting that the computer use policy incorporates the limitations of the Handbook).

The District Court also held that the School District did not violate the Snyders' parental rights under the Fourteenth Amendment. The Court concluded that "the school did not err in disciplining J.S., and her actions were not merely personal home activities[,]" and that therefore the Snyders' parental rights were not violated. The Court did not address directly the plaintiffs' state law argument, but did note that Pennsylvania law allows school districts to "punish students [] 'during such times as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.'" App. 22 (quoting 24 Pa. Cons. Stat. § 5-510). J.S. and her parents filed a timely appeal from the District Court's entry of summary judgment in favor of the School District and from its decision to deny their motion for summary judgment.

## II.

The District Court had jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4), and exercised supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367. We exercise jurisdiction under 28 U.S.C. § 1291.

We review a District Court's disposition of a summary judgment motion de novo. Pichler v. UNITE, 542 F.3d 380, 385 (3d Cir. 2008) (citing Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007)). In conducting this review, we use the same standard as the District Court should have applied. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 278 (3d Cir. 2000). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (setting forth the legal standard formerly found in Fed. R. Civ. P. 56(c)). All inferences must be viewed in the light most favorable to the

nonmoving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Farrell, 206 F.3d at 278, and where, as was the case here, the District Court considers cross-motions for summary judgment "the court construes facts and draws inferences 'in favor of the party against whom the motion under consideration is made,'" Pichler, 542 F.3d at 386 (quoting Samuelson v. LaPorte Cmty. Sch. Corp., 526 F.3d 1046, 1051 (7th Cir. 2008)).

"A disputed fact is 'material' if it would affect the outcome of the suit as determined by the substantive law." Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992). Importantly, the nonmoving party cannot satisfy its requirement of establishing a genuine dispute of fact merely by pointing to unsupported allegations found in the pleadings. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Instead, the party must raise more than "some metaphysical doubt," Matsushita, 475 U.S. at 586, and the court must determine that "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); see also Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770-71 (3d Cir. 2009). It is impermissible for the court to intrude upon the duties of the fact-finder by weighing the evidence or making credibility determinations. Pichler, 542 F.3d at 386. Finally, when the nonmoving party is the plaintiff, he must produce sufficient evidence to establish every element that he will be required to prove at trial. Celotex, 477 U.S. at 322.

III.

Although the precise issue before this Court is one of first impression, the Supreme Court and this Court have analyzed the extent to which school officials can regulate student speech in several thorough opinions that compel the conclusion that the School District violated J.S.'s First Amendment free speech rights when it suspended her for speech that caused no substantial disruption in school and that could not reasonably have led school officials to forecast substantial disruption in school.

A.

11

We begin our analysis by recognizing the "comprehensive authority" of teachers and other public school officials. Tinker, 393 U.S. at 507. See generally Veronia Sch. Dist. 47J v. Acton, 515 U.S. 646, 655 (1995) (describing the public schools' power over public school children as both "custodial and tutelary"). Those officials involved in the educational process perform "important, delicate, and highly discretionary functions." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 637 (1943). As a result, federal courts generally exercise restraint when considering issues within the purview of public school officials. See Bd. of Educ., Island Trees Union Free Sch. Dist. v. Pico, 457 U.S. 853, 864 (1982) ("[F]ederal courts should not ordinarily 'intervene in the resolution of conflicts which arise in the daily operation of school systems.'" (quoting Epperson v. Arkansas, 393 U.S. 97, 104 (1968))); see also Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 266 (1988) ("[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges.").

The authority of public school officials is not boundless, however. The First Amendment unquestionably protects the free speech rights of students in public school. Morse, 551 U.S. at 396 ("Our cases make clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.'" (quoting Tinker, 393 U.S. at 506)). Indeed, "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." Shelton v. Tucker, 364 U.S. 479, 487 (1960). The exercise of First Amendment rights in school, however, has to be "applied in light of the special characteristics of the school environment," Tinker, 393 U.S. at 506, and thus the constitutional rights of students in public schools "are not automatically coextensive with the rights of adults in other settings," Fraser, 478 U.S. at 682. Since Tinker, courts have struggled to strike a balance between safeguarding students' First Amendment rights and protecting the authority of school administrators to maintain an appropriate learning environment.

The Supreme Court established a basic framework for assessing student free speech claims in Tinker, and we will assume,

without deciding, that <u>Tinker</u> applies to J.S.'s speech in this case.[3] The Court in <u>Tinker</u> held that "to justify prohibition of a particular expression of opinion," school officials must demonstrate that "the forbidden conduct would <u>materially and substantially interfere</u> with the requirements of appropriate discipline in the operation of the school." <u>Tinker</u>, 393 U.S. at 509 (emphasis added) (quotation marks omitted). This burden cannot be met if school officials are driven by "a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." <u>Id.</u> Moreover, "<u>Tinker</u> requires a specific and significant fear of disruption, not just some remote apprehension of disturbance." <u>Saxe v. State Coll. Area Sch. Dist.</u>, 240 F.3d 200, 211 (3d Cir. 2001). Although <u>Tinker</u> dealt with political speech, the opinion has never been confined to such speech. <u>See id.</u> at 215-17 (holding that the school's anti-harassment policy was overbroad because it "appears to cover substantially more speech than could be prohibited under <u>Tinker</u>'s substantial disruption test"); <u>see also</u> Killion, 136 F. Supp. 2d at 455-58 (holding that the school overstepped its constitutional bounds under Tinker when it suspended a student for making "lewd" comments about the school's athletic director in an e-mail the student wrote at home and circulated to the non-school e-mail accounts of several classmates).

As this Court has emphasized, with then-Judge Alito writing for the majority, <u>Tinker</u> sets the general rule for regulating school speech, and that rule is subject to several <u>narrow</u> exceptions. <u>Saxe</u>, 240 F.3d at 212 ("Since <u>Tinker</u>, the Supreme Court has carved out a number of narrow categories of speech that a school may restrict even without the threat of substantial disruption."). The first exception is set out in <u>Fraser</u>, which we interpreted to permit school officials to regulate "'lewd,' 'vulgar,' 'indecent,' and 'plainly offensive' speech <u>in school</u>." <u>Id.</u> at 213 (quoting <u>Fraser</u>, 478 U.S. at 683, 685) (emphasis added); <u>see also</u> <u>Sypniewski v.</u>

---

[3]The appellants argue that the First Amendment "limits school official[s'] ability to sanction student speech to the schoolhouse itself." Appellants' Br. 25. While this argument has some appeal, we need not address it to hold that the School District violated J.S.'s First Amendment free speech rights.

Warren Hills Reg'l Bd. of Educ., 307 F.3d 243, 253 (3d Cir. 2002) (quoting Saxe's narrow interpretation of the Fraser exception). The second exception to Tinker is articulated in Hazelwood School District v. Kuhlmeier, which allows school officials to "regulate school-sponsored speech (that is, speech that a reasonable observer would view as the school's own speech) on the basis of any legitimate pedagogical concern." Saxe, 240 F.3d at 214.

The Supreme Court recently articulated a third exception to Tinker's general rule in Morse. Although, prior to this case, we have not had an opportunity to analyze the scope of the Morse exception, the Supreme Court itself emphasized the narrow reach of its decision. In Morse, a school punished a student for unfurling, at a school-sponsored event, a large banner containing a message that could reasonably be interpreted as promoting illegal drug use. 551 U.S. at 396. The Court emphasized that Morse was a school speech case, because "[t]he event occurred during normal school hours," was sanctioned by the school "as an approved social event or class trip," was supervised by teachers and administrators from the school, and involved performances by the school band and cheerleaders. Id. at 400-01 (quotation marks omitted). The Court then held that "[t]he 'special characteristics of the school environment,' Tinker, 393 U.S.[] at 506 [], and the governmental interest in stopping student drug abuse . . . allow schools to restrict student expression that they reasonably regard as promoting illegal drug use." Id. at 408.

Notably, Justice Alito's concurrence in Morse further emphasizes the narrowness of the Court's holding, stressing that Morse "stand[s] at the far reaches of what the First Amendment permits." 551 U.S. at 425 (Alito, J., concurring). In fact, Justice Alito only joined the Court's opinion "on the understanding that the opinion does not hold that the special characteristics of the public schools necessarily justify any other speech restrictions" than those recognized by the Court in Tinker, Fraser, Kuhlmeier, and Morse. Id. at 422-23. Justice Alito also noted that the Morse decision "does not endorse the broad argument . . . that the First Amendment permits public school officials to censor any student speech that interferes with a school's 'educational mission.' This argument can easily be manipulated in dangerous ways, and I

14

would reject it before such abuse occurs." Id. at 423 (citations omitted). Moreover, Justice Alito engaged in a detailed discussion distinguishing the role of school authorities from the role of parents, and the school context from the "[o]utside of school" context. Id. at 424-25.

B.

There is no dispute that J.S.'s speech did not cause a substantial disruption in the school. The School District's counsel conceded this point at oral argument and the District Court explicitly found that "a substantial disruption so as to fall under Tinker did not occur." App. at 17. Nonetheless, the School District now argues that it was justified in punishing J.S. under Tinker because of "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities . . . ." Tinker, 393 U.S. at 514. Although the burden is on school authorities to meet Tinker's requirements to abridge student First Amendment rights, the School District need not prove with absolute certainty that substantial disruption will occur. Doninger v. Niehoff, 527 F.3d 41, 51 (2d Cir. 2008) (holding that Tinker does not require "actual disruption to justify a restraint on student speech"); Lowery v. Euverard, 497 F.3d 584, 591-92 (6th Cir. 2007) ("Tinker does not require school officials to wait until the horse has left the barn before closing the door. . . . [It] does not require certainty, only that the forecast of substantial disruption be reasonable."); LaVine v. Blaine Sch. Dist., 257 F.3d 981, 989 (9th Cir. 2001) ("Tinker does not require school officials to wait until disruption actually occurs before they may act.").

The facts in this case do not support the conclusion that a forecast of substantial disruption was reasonable. In Tinker, the Supreme Court held that "our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands [to protest the Vietnam War] would substantially interfere with the work of the school or impinge upon the rights of other students." 393 U.S. at 509. Given this holding, it is important to consider the record

15

before the Supreme Court in Tinker and compare it to the facts of this case.

The relevant events in Tinker took place in December 1965, the year that over 200,000 U.S. troops were deployed to Vietnam as part of Operation Rolling Thunder. Justice Black dissented in Tinker, noting that "members of this Court, like all other citizens, know, without being told, that the disputes over the wisdom of the Vietnam war have disrupted and divided this country as few other issues [e]ver have." Id. at 524 (Black, J., dissenting). In fact, the Tinker majority itself noted the school authorities' concern about the effect of the protest on friends of a student who was killed in Vietnam. See id. at 509 n.3. Justice Black also emphasized the following portions of the record:

> the [] armbands caused comments, warnings by other students, the poking of fun at them, and a warning by an older football player that other, nonprotesting students had better let them alone. There is also evidence that a teacher of mathematics had his lesson period practically 'wrecked' chiefly by disputes with [a protesting student] who wore her armband for her 'demonstration.'

Id. at 517 (Black, J., dissenting). Based on these facts, Justice Black disagreed with the Tinker majority's holding that the armbands did not cause a substantial disruption in school: "I think the record overwhelmingly shows that the armbands did exactly what the elected school officials and principals foresaw they would, that is, took the students' minds off their classwork and diverted them to thoughts about the highly emotional subject of the Vietnam war." Id. at 518; see also id. at 524 ("Of course students, like other people, cannot concentrate on lesser issues when black armbands are being ostentatiously displayed in their presence to call attention to the wounded and dead of the war, some of the wounded and the dead being their friends and neighbors.").

This was the record in Tinker, and yet the majority in that case held that "the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial

16

disruption of or material interference with school activities," and thus that the school violated the students' First Amendment rights. Id. at 514 (emphasis added). Turning to our record, J.S. created the profile as a joke, and she took steps to make it "private" so that access was limited to her and her friends. Although the profile contained McGonigle's picture from the school's website, the profile did not identify him by name, school, or location. Moreover, the profile, though indisputably vulgar, was so juvenile and nonsensical that no reasonable person could take its content seriously, and the record clearly demonstrates that no one did.[4] Also, the School District's computers block access to MySpace, so no Blue Mountain student was ever able to view the profile from school.[5] And, the only printout of the profile that was ever brought

---

[4]Indeed, although Superintendent Romberger had a duty to report allegations of inappropriate sexual contact or other misconduct by officials in the School District, she did not report McGonigle, because she believed the content of the profile was not true. App. 295-307. In fact, Romberger did not even question McGonigle as to whether any of the content was true. App. 307.

[5]We agree with the appellants' argument that 24 Pa. Cons. Stat. § 5-510 also barred the School District from punishing J.S. for her off-campus speech. Section 5-510 limited the authority of the School District to:

> adopt[ing] and enforc[ing] such reasonable rules and regulations . . . regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.

24 Pa. Cons. Stat. § 5-510 (emphasis added). The dissent notes that § 5-510 permits a school district to exercise "such control as is necessary to prevent infractions of discipline and interference with the educational process." D.O.F. v. Lewisburg Area Sch. Dist. Bd. of Sch. Dirs., 868 A.2d 28, 36 (Pa. Commw. Ct. 2004). While that may be true, the Pennsylvania Commonwealth Court has

17

to school was one that was brought at McGonigle's express request. Thus, beyond general rumblings, a few minutes of talking in class, and some officials rearranging their schedules to assist McGonigle in dealing with the profile, no disruptions occurred.[6]

In comparing our record to the record in Tinker, this Court cannot apply Tinker's holding to justify the School District's actions in this case. As the Supreme Court has admonished, an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Tinker, 393 U.S. at 508. If Tinker's black armbands – an ostentatious reminder of the highly emotional and controversial subject of the Vietnam war – could not "reasonably have led school authorities to forecast substantial disruption of or material interference with school activities," id. at 514, neither can J.S.'s profile, despite the unfortunate humiliation it caused for McGonigle.[7]

_____

interpreted this provision to prohibit a school district from punishing students for conduct occurring outside of school hours – even if such conduct occurs on school property. See id. at 35-36.

All of the integral events in this case occurred outside the school, during non-school hours. Accordingly, § 5-510 also barred the School District from punishing J.S.

[6]McGonigle testified that after this lawsuit was filed, there was a general decline in student discipline and that he believed this litigation itself encouraged other students to misbehave because they thought they could simply file a lawsuit to alleviate any trouble. App. 350-51. McGonigle's testimony in this regard is irrelevant to the issues before this Court because these disruptions did not arise out of the creation of the profile itself, but rather, were the direct result of the School District's response to the profile and the ensuing litigation. This testimony, therefore, is not relevant to determining the level of disruption that the profile caused in the school.

[7]We recognize that vulgar and offensive speech such as that employed in this case – even made in jest – could damage the careers of teachers and administrators and we conclude only that

18

Courts must determine when an "undifferentiated fear or apprehension of disturbance" transforms into a reasonable forecast that a substantial disruption or material interference will occur. The School District cites several cases where courts held that a forecast of substantial and material disruption was reasonable. See, e.g., Doninger, 527 F.3d at 50-51 (holding that punishment was justified, under Tinker, where a student's derogatory blog about the school was "purposely designed by [the student] to come onto the campus," to "encourage others to contact the administration," and where the blog contained "at best misleading and at worst false information" that the school "need[ed] to correct" (quotation marks and alteration omitted)); Lowery, 497 F.3d at 596 (holding that punishment was justified, under Tinker, where students circulated a petition to fellow football players calling for the ouster of their football coach, causing the school to have to call a team meeting to ensure "team unity," and where not doing so "would have been a grave disservice to the other players on the team"); LaVine, 257 F.3d at 984, 989-90 (holding that the school district did not violate a student's First Amendment rights when it expelled him on an emergency basis "to prevent [] potential violence on campus" after he showed a poem entitled "Last Words" to his English teacher, which was "filled with imagery of violent death and suicide" and could "be interpreted as a portent of future violence, of the shooting of [] fellow students").

the punitive action taken by the School District violated the First Amendment free speech rights of J.S.

To the extent the dissent supports its arguments regarding material and substantial disruption by speculating about the possibility of discomfort by the recipients of the speech in this case, we cite then-Judge Alito's admonition in Saxe that "[t]he Supreme Court has held time and time again, both within and outside of the school context, that the mere fact that someone might take offense at the content of the speech is not sufficient justification for prohibiting it." 240 F.3d at 215; see also Tinker, 393 U.S. at 509 (holding school officials cannot prohibit student speech based upon the desire to avoid "discomfort and unpleasantness").

The School District likens this case to the above cases by contending that the profile was accusatory and aroused suspicions among the school community about McGonigle's character because of the profile's references to his engaging in sexual misconduct. As explained above, however, this contention is simply not supported by the record. The profile was so outrageous that no one could have taken it seriously, and no one did. Thus, it was clearly not reasonably foreseeable that J.S.'s speech would create a substantial disruption or material interference in school, and this case is therefore distinguishable from the student speech at issue in Doninger, Lowery, and LaVine.

Moreover, unlike the students in Doninger, Lowery, and LaVine, J.S. did not even intend for the speech to reach the school – in fact, she took specific steps to make the profile "private" so that only her friends could access it. The fact that her friends happen to be Blue Mountain Middle School students is not surprising, and does not mean that J.S.'s speech targeted the school. Finally, any suggestion that, absent McGonigle's actions, a substantial disruption would have occurred, is directly undermined by the record. If anything, McGonigle's response to the profile exacerbated rather than contained the disruption in the school.[8]

_____

[8]The dissent concludes that our decision creates a circuit split with the Court of Appeals for the Second Circuit, positing that that court has determined "that off-campus hostile and offensive student internet speech that is directed at school officials results in a substantial disruption of the classroom environment." Dissenting Op. 22. We disagree, largely because the dissent has overstated our sister circuit's law. Each case applying Tinker is decided on its own facts, see Doninger, 527 F.3d at 53 ("We decide only that based on the existing record, [the student's] post created a foreseeable risk of substantial disruption to the work and discipline of the school . . . ."), Wisniewski v. Bd. of Educ. of Weedsport Cent. Sch. Dist., 494 F.3d 34, 40 (2d Cir. 2007) (deciding case "on this record"), so all "off-campus hostile and offensive student internet speech" will not necessarily create a material and substantial disruption at school nor will it reasonably lead school officials to forecast substantial disruption in school. Further, the

The facts simply do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school as a result of J.S.'s profile. Under <u>Tinker</u>, therefore, the School District violated J.S.'s First Amendment free speech rights when it suspended her for creating the profile.[9]

facts of the cases cited by the dissent in support of its proposition that we have created a circuit split differ considerably from the facts presented in this case. <u>See, e.g.,</u> <u>Doninger</u>, 527 F.3d at 50-51; <u>Wisniewski</u>, 494 F.3d at 35 (involving a student "sharing with friends via the Internet a small drawing crudely, but clearly, suggesting that a named teacher should be shot and killed"). Accordingly, we do not perceive any circuit split and will continue to decide each case on its individual facts.

[9]The School District seizes upon language in <u>Tinker</u> that is arguably dicta, claiming that it was justified in abridging J.S.'s First Amendment rights because the profile defamed McGonigle. School District Br. 28-33. In <u>Tinker</u>, the Court discussed its concern with "the rights of other students to be let alone." 393 U.S. at 508. As a result, the Court appeared to indicate that school officials could stop conduct that would "impinge upon the rights of other students." <u>Id.</u> at 509. Later in the opinion, the Court reiterated the point, but referred simply to "invasion of the rights of others." <u>Id.</u> at 513. Although McGonigle is not a student, the School District claims J.S's speech is not immunized by the First Amendment because McGonigle's right to be free from defamation fits within this language in <u>Tinker</u>. We are not aware of any decisions analyzing whether this language applies to anyone other than "students," but we do note that our cases have employed both of these clauses. <u>See, e.g.,</u> <u>Walker-Serrano</u>, 325 F.3d at 416-17; <u>Sypniewski</u>, 307 F.3d at 264, 265; <u>Saxe</u>, 240 F.3d at 214, 217. We further note there is a danger in accepting the School District's argument: if that portion of <u>Tinker</u> is broadly construed, an assertion of virtually any "rights" could transcend and eviscerate the protections of the First Amendment. <u>See generally</u> <u>Snyder v. Phelps</u>, 131 S. Ct. 1207 (2011) (noting that the First Amendment imposes limitations on the ability to recover in tort). In any event, we agree with J.S. that, as a matter of law, McGonigle could not

21

C.

Because Tinker does not justify the School District's suspension of J.S., the only way for the punishment to pass constitutional muster is if we accept the School District's argument – and the District Court's holding – that J.S.'s speech can be prohibited under the Fraser exception to Tinker.[10] The School District argues that although J.S.'s speech occurred off campus, it was justified in disciplining her because it was "lewd, vulgar, and offensive [and] had an effect on the school and the educational mission of the District." School District Br. 7. The School District's argument fails at the outset because Fraser does not apply to off-campus speech. Specifically in Morse, Chief Justice Roberts, writing for the majority, emphasized that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 405 (citing Cohen v. Cal., 403 U.S. 15 (1971)).[11] The Court's citation to the Cohen decision is noteworthy. The Supreme Court in Cohen held,

---

succeed in his claim that the profile violated his right to be free from defamation. See Hustler Magazine, Inc. v. Falwell, 485 U.S. 46, 57 (1988) (holding that a libel claim cannot survive where no reasonable observer can understand the statements to be describing actual facts or events); Wecht v. PG Publ'g Co., 510 A.2d 769, 774 (Pa. Super Ct. 1986) ("Even the most inattentive reader would not accept this article as a factual narrative. Considering the totality of the printed material . . . we find this publication incapable of defamatory meaning."); see also Davis v. Monroe County Bd. of Educ., 526 U.S. 629, 652 (1999) (holding "simple acts of teasing and name-calling" are not actionable).

[10] Indisputably, neither Kuhlmeier nor Morse governs this case.

[11] Notably, in Morse, Chief Justice Roberts also cited Justice Brennan's concurrence in Fraser, which noted, "[i]f respondent had given the same speech outside of the school environment, he could not have been penalized simply because government officials considered his language to be inappropriate." Fraser, 478 U.S. at 688 (Brennan, J., concurring) (citing Cohen, 403 U.S. 15).

22

in a non-school setting, that a state may not make a "single four-letter expletive a criminal offense." 403 U.S. at 26. Accordingly, Chief Justice Roberts's reliance on the Cohen decision reaffirms that a student's free speech rights outside the school context are coextensive with the rights of an adult.

Thus, under the Supreme Court's precedent, the Fraser exception to Tinker does not apply here. In other words, Fraser's "lewdness" standard cannot be extended to justify a school's punishment of J.S. for use of profane language outside the school, during non-school hours.[12]

The School District points out that "a hard copy or printout of the profile actually came into the school." School District Br. 22. However, the fact that McGonigle caused a copy of the profile to be brought to school does not transform J.S.'s off-campus speech into school speech. The flaws of a contrary rule can be illustrated by extrapolating from the facts of Fraser itself. As discussed above, the Supreme Court emphasized that Fraser's speech would have been protected had he delivered it outside the

_____

[12]The School District notes that the courts in Doninger and Bethlehem Area School District suggested that Fraser applies to vulgar off-campus speech. See Doninger, 527 F.3d at 49 ("It is not clear . . . [whether] Fraser applies to off-campus speech."); Bethlehem Area Sch. Dist., 807 A.2d at 867 ("[W]e are not convinced that reliance solely on Tinker is appropriate."). Not only are these cases not binding on this Court, but also both Doninger and Bethlehem Area School District ultimately relied on Tinker, not Fraser, in upholding school censorship. Thus, the courts' suggestion that the Fraser standard may apply to off-campus speech is dicta. Most importantly, that dicta is undermined directly by Chief Justice Roberts's statement in Morse: "Had Fraser delivered the same speech in a public forum outside the school context, it would have been protected." 551 U.S. at 405 (citing Cohen, 403 U.S. 15). The most logical reading of Chief Justice Roberts's statement prevents the application of Fraser to speech that takes place off-campus, during non-school hours, and that is in no way sponsored by the school.

school. Presumably, this protection would not be lifted if a school official or Fraser's fellow classmate overheard the off-campus speech, recorded it, and played it to the school principal.[13] Similarly here, the fact that another student printed J.S.'s profile and brought it to school at the express request of McGonigle does not turn J.S.'s off-campus speech into on-campus speech.

Under these circumstances, to apply the Fraser standard to justify the School District's punishment of J.S.'s speech would be to adopt a rule that allows school officials to punish any speech by a student that takes place anywhere, at any time, as long as it is about the school or a school official, is brought to the attention of a school official, and is deemed "offensive" by the prevailing authority. Under this standard, two students can be punished for using a vulgar remark to speak about their teacher at a private party, if another student overhears the remark, reports it to the school authorities, and the school authorities find the remark "offensive." There is no principled way to distinguish this hypothetical from the facts of the instant case.

Accordingly, we conclude that the Fraser decision did not give the School District the authority to punish J.S. for her off-campus speech.

\* \* \* \* \*

Neither the Supreme Court nor this Court has ever allowed schools to punish students for off-campus speech that is not school-sponsored or at a school-sponsored event and that caused no substantial disruption at school. We follow the logic and letter of these cases and reverse the District Court's grant of summary judgment in favor of the School District and denial of J.S.'s motion for summary judgment on her free speech claim. An opposite holding would significantly broaden school districts' authority over student speech and would vest school officials with dangerously

---

[13]Note that the question of whether a school has the authority to punish a student who brings vulgar speech into school is separate from whether the school can punish the source of that speech.

overbroad censorship discretion.  We will remand to the District Court to determine appropriate relief on this claim.

IV.

We next turn to the argument of J.S.'s parents that the School District violated their Fourteenth Amendment due process right to raise their child in the manner that they saw fit. Specifically, they argue that, in disciplining J.S. for conduct that occurred in her parents' home during non-school hours, the School District interfered with their parental rights.

As the Supreme Court has noted, "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." Troxel v. Granville, 530 U.S. 57, 66 (2000).  This liberty interest, however, is not absolute, Anspach v. City of Phila., 503 F.3d 256, 261 (3d Cir. 2007), and "there may be circumstances in which school authorities, in order to maintain order and a proper educational atmosphere in the exercise of police power, may impose standards of conduct on students that differ from those approved by some parents," Gruenke v. Seip, 225 F.3d 290, 304 (3d Cir. 2000). Should the school policies conflict with the parents' liberty interest, the policies may only prevail if they are "tied to a compelling interest." Id. at 305.

A conflict with the parents' liberty interest will not be lightly found, and, indeed, only occurs when there is some "manipulative, coercive, or restraining conduct by the State." Anspach, 503 F.3d at 266.  In other words, the parents' liberty interest will only be implicated if the state's action "deprived them of their right to make decisions concerning their child," and not when the action merely "complicated the making and implementation of those decisions." C.N. v. Ridgewood Bd. of Educ., 430 F.3d 159, 184 (3d Cir. 2005).  On the other hand, however, the level of interference required to find a conflict between the school district's policy and the parents' liberty interest may vary depending on the significance of the subject at issue, and

25

the threshold for finding a conflict will not be as high when the school district's actions "strike at the heart of parental decision-making authority on matters of the greatest importance." Id.

In this case, J.S.'s parents allege that the School District interfered with their ability to determine what out-of-school behavior warranted discipline and what form that discipline took. This, however, is not an accurate description of the impact that the School District's actions had upon J.S.'s parents' ability to make decisions concerning their daughter's upbringing. The School District's actions in no way forced or prevented J.S.'s parents from reaching their own disciplinary decision, nor did its actions force her parents to approve or disapprove of her conduct. Further, there was no triggering of the parents' liberty interest due to the subject matter of the School District's involvement; a decision involving a child's use of social media on the internet is not a "matter[] of the greatest importance." Compare C.N., 430 F.3d at 184-85 (determining that no due process violation occurred when a school, without first receiving permission from parents, distributed surveys to students that included questions about sexual activity and substance abuse), with Gruenke, 225 F.3d at 306-07 (finding a due process violation when a school coach did not inform a student's parents of their daughter's positive pregnancy test). Under these circumstances, we cannot find that J.S.'s parents' liberty interest was implicated, and will affirm the District Court's grant of summary judgment on their Fourteenth Amendment due process claim.

V.

Finally, J.S. challenges the Blue Mountain Student-Parent Handbook ("Handbook") and the Acceptable Use of the Computers, Network, Internet, Electronic Communications System and Information Policy ("AUP") as unconstitutionally overbroad and vague. Relying largely on the testimony of McGonigle and Romberger, J.S. encourages this Court to strike down these School District policies.

26

"A regulation is unconstitutional on its face on overbreadth grounds where there is []'a likelihood that the statute's very existence will inhibit free expression' by 'inhibiting the speech of third parties who are not before the Court.'" Saxe, 240 F.3d at 214 (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 799 (1984)). "[T]he overbreadth doctrine is not casually employed," Sypniewski, 307 F.3d at 258 (quoting L.A. Police Dep't v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999)), and before concluding that a law is unconstitutionally overbroad, the court must first determine that the regulation is not "susceptible to a reasonable limiting construction," Saxe, 240 F.3d at 215. Further, a law will only be struck down as overbroad if the overbreadth is "not only real but substantial in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). In undertaking this analysis in the public school setting, however, it is important to recognize that the school district may permissibly regulate a broader range of speech than could be regulated for the general public, giving school regulations a larger plainly legitimate sweep. Sypniewski, 307 F.3d at 259. Due to this consideration and concerns about the responsibilities with which public schools are tasked, we have adopted a "more hesitant application," id. at 259, of the overbreadth doctrine within public schools. Accordingly, "a school disciplinary policy will be struck down as overbroad only after consideration of the special needs of school discipline has been brought to bear together with the law's general hesitation to apply this 'strong medicine.'" Id. at 260.

J.S.'s argument that the School District's policies are overbroad in that they reach out-of-school speech fails on factual grounds, as the policies are explicitly limited to in-school speech. The Handbook states that the authority of the principals and teachers within the District is limited to "those times when students are under the direct control and supervision of school district officials." App. 58. In addition, the specific policy on computer usage in the Handbook states that "[s]tudents may not create, copy, receive, or use data, language or graphics which are obscene, threatening, abusive, or otherwise inappropriate at school or on sign out equipment at home." App. 61. The AUP is similarly limited in scope, and defines "computer" as

27

any school district owned, leased or licensed or employee, student and guest owned personal hardware, software or other technology used on school district premises or at school district events, or connected to the school district network, containing school district programs or school district or student data . . . attached or connected to, installed in, or otherwise used in connection with a computer.

App. 40. We need not give these regulations a limiting construction, therefore, as the School District has already limited the reach of its policies.

What J.S. challenges here is not the policies themselves, but the interpretation of these policies that allows the School District to apply its regulations beyond the times when she was within the direct control and supervision of the School District, or beyond times when she was using a school computer. The misinterpretation of these policies by specific individuals, however, does not make the policies overbroad. Although the Handbook and AUP can be applied in a way that violates a student's constitutional rights, as happened in this case, the regulations themselves are not constitutionally infirm on the basis of being overbroad. For this reason, we will affirm the District Court's grant of summary judgment on this issue.

Our vagueness inquiry is grounded in the notice requirement of the Fourteenth Amendment's due process clause. City of Chicago v. Morales, 527 U.S. 41, 56 (1999). A statute will be considered void for vagueness if it does not allow a person of ordinary intelligence to determine what conduct it prohibits, or if it authorizes arbitrary enforcement. Hill v. Colorado, 530 U.S. 703, 732 (2000). This standard, however, is more relaxed in the school environment: "Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." Fraser, 478 U.S. at 686. This Court has declared that school disciplinary rules should be struck down "only when the vagueness is especially problematic," Sypniewski, 307 F.3d at 266,

and has upheld a school disciplinary policy that required students to conform to "'an imprecise but comprehensible normative standard,'" id. (quoting Coates v. City of Cincinnati, 402 U.S. 61, 614 (1971)).

Again, we will affirm the District Court's determination that the School District's policies were not facially unconstitutional. The policies clearly define when and where they apply. Further, the content of the regulations is not impermissibly vague. Although the AUP prohibits a broad range of uses of the School District's computers (including accessing or transmitting "material likely to be offensive or objectionable to recipients," App. 47), the addition of specific examples of impermissible usages draws this policy within the purview of Sypniewski, and articulates a comprehensible normative standard. For example, under the general prohibition against offensive material, the AUP specifically prohibits defamatory, sexually explicit, discriminatory, and violent material. App. 47-48. There can be no doubt that J.S. would have expected to have been punished under the Handbook and the AUP had she taken the same actions from a school computer or while on school grounds. In this sense, they establish a comprehensible normative standard that is appropriate for use in disciplining student misconduct.

As with the discussion of overbreadth above, J.S.'s argument seems to rely on specific individuals' misinterpretations of the policies, and not the invalidity of the policies themselves. It was the extension and application of these policies to speech undertaken from her personal computer at her parents' home to which she objects here. This punishment, however, was not allowed by the vagueness of the policies. Instead, it was implemented despite the fact that these policies quite clearly did not extend to the conduct at issue. As the policies are not unconstitutionally vague, much less vague in a manner that is "especially problematic," we will affirm the District Court's grant of summary judgment on this issue.

## VI.

For the foregoing reasons, the District Court's judgment will be affirmed in part, reversed in part and remanded.

*J.S. v. Blue Mountain School District*, No. 08-4138

SMITH, *Circuit Judge*, concurring, with whom McKEE, *Chief Judge*, SLOVITER, FUENTES, and HARDIMAN, *Circuit Judges*, join.

Because the school district suspended J.S. for speech that she engaged in at home on a Sunday evening, I fully agree with the majority's conclusion that it violated J.S.'s First Amendment rights. I write separately to address a question that the majority opinion expressly leaves open: whether *Tinker* applies to off-campus speech in the first place. I would hold that it does not, and that the First Amendment protects students engaging in off-campus speech to the same extent it protects speech by citizens in the community at large.

As a general matter, the First Amendment strictly protects speech regardless of whether it is disruptive, offensive, vulgar, or insulting. *See Texas v. Johnson*, 491 U.S. 397, 408–10, 414 (1989); *Hustler Magazine v. Falwell*, 485 U.S. 46, 54–57 (1988); *Cohen v. California*, 403 U.S. 15, 25–26 (1971). In *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503 (1969), the Supreme Court considered whether different rules should govern student speech inside public schools. Although it observed that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," the Court determined that, "in light of the special characteristics of the school environment" and the need to defer to school officials' authority "to prescribe and control conduct in the schools," the First Amendment's ordinarily strict protection of speech rights should be relaxed in the public-school context. *Id.* at 506–08. The Court thus

1

concluded that some otherwise-protected speech can be suppressed in the school setting, but only if it "would materially and substantially disrupt the work and discipline of the school." *Id.* at 513.

In later cases, the Court recognized exceptions to *Tinker*, holding that even non-disruptive school speech can be restricted if it is lewd or vulgar, *Bethel Sch. Dist. 403 v. Fraser*, 478 U.S. 675, 685 (1986), if it is school-sponsored and the restriction is "reasonably related to legitimate pedagogical concerns," *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988), or if it is reasonably viewed as promoting the use of illegal drugs, *Morse v. Frederick*, 551 U.S. 393, 403 (2007).

Courts agree that *Fraser*, *Kuhlmeier*, and *Morse* apply solely to on-campus speech (I use the phrase "on-campus speech" as shorthand for speech communicated at school or, though not on school grounds, at a school-sanctioned event, *see Morse*, 551 U.S. at 400–01). Indeed, the Supreme Court has expressly recognized that *Fraser* does not extend "outside the school context," *id.* at 405 (citing *Cohen*), and three justices have observed (without objection from the other six) that speech promoting illegal drug use, even if proscribable in a public school, would "unquestionably" be protected if uttered elsewhere, *id.* at 434 (Stevens, J., joined by Souter and Ginsburg, JJ., dissenting). Lower courts, however, are divided on whether *Tinker*'s substantial-disruption test governs students' off-campus expression. *Compare Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615, 620 (5th Cir. 2004) (*Tinker* does not apply to students' off-campus speech), *Thomas v. Bd. of Educ., Granville Cent. Sch. Dist.*, 607 F.2d 1043, 1050, 1053 n.18 (2d Cir. 1979) (distinguishing *Tinker* in a case involving off-campus expression), *and Klein v.*

2

*Smith*, 635 F. Supp. 1440, 1441 (D. Me. 1986), *with Wisniewski v. Bd. of Educ. of the Weedsport Cent. Sch. Dist.*, 494 F.3d 34, 39 & n.4 (2d Cir. 2007) (*Tinker* applies to off-campus speech in certain circumstances), *J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1104, 1107 (C.D. Cal. 2010) (same), *and Killion v. Franklin Reg'l Sch. Dist.*, 136 F. Supp. 2d 446, 454–55 (W.D. Pa. 2001). In my view, the decisions holding that *Tinker* does not apply to off-campus speech have the better of the argument.

*Tinker*'s holding is expressly grounded in "the special characteristics of the school environment," 393 U.S. at 506, and the need to defer to school officials' authority "to prescribe and control conduct in the schools," *id.* at 507.[1] The Court's later school-speech cases underscored *Tinker*'s narrow reach. *Tinker*, according to the Court's decision in *Fraser*, rests on the understanding that "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *see* 478 U.S. at 682, and that students are a captive audience while at school, *see id.* at 684. *See also id.* at 688 n.1

---

[1] *Tinker* did say that the substantial-disruption standard governs student speech "in class or out of it." 393 U.S. at 513. Read in context, though, it is clear that the phrase "or out of it" does not mean "out of school" but rather "in the cafeteria, or on the playing field, or on the campus during the authorized hours." *Id.* at 512–13. *See also id.* at 508 ("Any word spoken, *in class, in the lunchroom, or on the campus*, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk . . . .") (emphasis added). Had the Court intended to vest schools with the unprecedented authority to regulate students' off-campus speech, surely it would have done so unambiguously.

3

(Brennan, J., concurring in judgment) (stating that the Court's school-speech cases "obviously do not [apply] outside of the school environment"). *Kuhlmeier*, moreover, described *Tinker* as "address[ing] educators' ability to silence a student's personal expression that happens to occur on the school premises." 484 U.S. at 271. Finally, in *Morse*, the Court took care to refute the contention that the plaintiff's speech, which took place at a school field trip, did not occur "at school." 551 U.S. at 401. In concluding that the plaintiff's suit was governed by the *Tinker* line of cases, the Court stressed that the field trip "occurred during normal school hours," that it "was sanctioned by [the principal] as an approved social event or class trip," that "[t]eachers and administrators were interspersed among the students and charged with supervising them," and that the "high school band and cheerleaders performed." *Id.* at 400–01. If *Tinker* and the Court's other school-speech precedents applied to off-campus speech, this discussion would have been unnecessary. *See also id.* at 406 ("'First . . . Amendment rights [] are different in public schools than elsewhere.'") (quoting *Veronia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 656 (1995)). Indeed, in his *Morse* concurrence, Justice Alito essentially recognized that *Tinker*'s substantial-disruption test does not apply to students' off-campus expression. *See id.* at 422 (Alito, J., concurring) (noting that *Tinker* allows schools to regulate "in-school student speech . . . in a way that would not be constitutional in other settings"). *Accord Sypniewski v. Warren Hills Reg'l Bd. of Educ.*, 307 F.3d 243, 259 (3d Cir. 2002) (stating that under *Tinker*, a "broader . . . area of speech can be regulated at school than outside school").

The Second Circuit addressed a school's punishment of off-campus speech in *Thomas v. Board of Education,*

4

*Granville Central School District*, *supra*. There, a public high school suspended students for publishing an "underground" newspaper, which was "saturated with distasteful sexual satire, including an editorial on masturbation and articles alluding to prostitution, sodomy, and castration." 607 F.2d at 1045 n.3. Although the students had composed "an occasional article" in the school building after classes, the rest of the publication process, including printing and distribution of the newspaper, had occurred off campus after school hours. *Id.* at 1045. The students were suspended after a teacher confiscated a copy of the newspaper that another student had taken to school. In the ensuing § 1983 suit, the Second Circuit concluded that *Tinker* did not control because the newspaper was best viewed as off-campus speech. *Id.* at 1050. The court therefore applied general First Amendment law, determined that the school's actions were unconstitutional, and invalidated the students' suspensions. *Id.* at 1050–53.

The Fifth Circuit followed suit in *Porter v. Ascension Parish School Board*, *supra*. There, while sitting in the privacy of his own home, a high school student drew a picture of his school being attacked by missiles, helicopters, and armed assailants. 393 F.3d at 611. The student stored the picture in his closet. The school learned of the drawing when the student's younger brother inadvertently took it there. The school expelled the student. In the civil-rights action that followed, the Fifth Circuit determined that the picture amounted to off-campus speech and thus declined to apply *Tinker*, holding that it governs only "student expression 'that . . . occur[s] on the school premises.'" *Id.* at 615, 619 (quoting *Kuhlmeier*, 484 U.S. at 271). Applying general First Amendment principles, the court concluded that the picture

5

was not a "true threat," *see Watts v. United States*, 394 U.S. 705 (1969), and therefore was protected expression. *Id.* at 617–18. *See also Bystrom v. Fridley High Sch., Indep. Sch. Dist. No. 14*, 822 F.2d 747, 750 (8th Cir. 1987) (Arnold, J.); Lee Goldman, *Student Speech and the First Amendment: A Comprehensive Approach*, 63 Fla. L. Rev. 395, 430 (2011) (arguing that *Tinker* should not be applied to students' off-campus speech); Mary-Rose Papandrea, *Student Speech Rights in the Digital Age*, 60 Fla. L. Rev. 1027, 1093 (2008) ("[T]he *Tinker* approach to student speech is ill-suited to deal with off-campus expression.").

I agree with *Thomas* and *Porter*, and I believe that various post-*Tinker* pronouncements of the Supreme Court support their *ratio decidendi*. Applying *Tinker* to off-campus speech would create a precedent with ominous implications. Doing so would empower schools to regulate students' expressive activity no matter where it takes place, when it occurs, or what subject matter it involves—so long as it causes a substantial disruption at school. *Tinker*, for example, authorizes schools to suppress political speech—speech "at the core of what the First Amendment is designed to protect," *Morse*, 551 U.S. at 403—if it substantially disrupts school activities. *See* 393 U.S. at 513. Suppose a high school student, while at home after school hours, were to write a blog entry defending gay marriage. Suppose further that several of the student's classmates got wind of the entry, took issue with it, and caused a significant disturbance at school. While the school could clearly punish the students who acted disruptively, if *Tinker* were held to apply to off-campus speech, the school could also punish the student whose blog entry brought about the disruption. That cannot be, nor is it, the law.

6

To be sure, *this* case does not involve political speech. J.S. simply published an insulting (and, I would say, mean-spirited) parody of her principal on Myspace. But the lack of political content is irrelevant for First Amendment purposes. There is no First Amendment exception for offensive speech or for speech that lacks a certain quantum of social value. *Snyder v. Phelps*, 131 S. Ct. 1207, 1219–20 (2011); *United States v. Stevens*, 130 S. Ct. 1577, 1586, 1591 (2010); *Hustler Magazine*, 485 U.S. at 55; *Cohen*, 403 U.S. at 25–26; *FCC v. Pacifica Found.*, 438 U.S. 726, 763 (1978) (Brennan, J., dissenting) (observing that the Court has consistently "refuse[d] to embrace the notion, completely antithetical to basic First Amendment values, that the degree of protection the First Amendment affords protected speech varies with the social value ascribed to that speech by five [justices]"). It is worth pointing out, as well, that although speech like J.S.'s may appear to be worthless, it does enable citizens to vent their frustrations in nonviolent ways. We ought not to discount the importance in our society of such a "safety valve." *See* Rodney A. Smolla, *Free Speech in an Open Society* 13 (1992).

Furthermore, if *Tinker* were applied to off-campus speech, there would be little reason to prevent school officials from regulating *adult* speech uttered in the community. *Cf. Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 74 (1976) (noting that adults and children generally enjoy the same constitutional rights). Adults often say things that give rise to disruptions in public schools. Those who championed desegregation in the 1950s and 60s caused more than a minor disturbance in the southern schools. Of course, the prospect of using *Tinker* to silence such speakers is absurd. But the absurdity stems not from applying *Tinker* to off-campus

7

speech uttered by adults and students alike, but from the antecedent step of extending *Tinker* beyond the public-school setting to which it is so firmly moored. *See* Clay Calvert, *Off-Campus Speech, On-Campus Punishment: Censorship of the Emerging Internet Underground*, 7 B.U. J. Sci. & Tech. L. 243, 280–81 (2001). I would hold that *Tinker* does not govern a student's off-campus expression.[2]

But that is only half the battle. The other half: how can one tell whether speech takes place on or off campus? Answering this question will not always be easy. *See Morse*, 551 U.S. at 401. The answer plainly cannot turn solely on where the speaker was sitting when the speech was originally uttered. Such a standard would fail to accommodate the somewhat "everywhere at once" nature of the internet. So, for example, I would have no difficulty applying *Tinker* to a case where a student sent a disruptive email to school faculty from his home computer. Regardless of its place of origin, speech intentionally directed towards a school is properly considered on-campus speech. On the other hand, speech originating off campus does not mutate into on-campus speech simply because it foreseeably makes its way onto campus. *See Layshock v. Hermitage Sch. Dist.*, --- F.3d --- (3d Cir. 2011) (en banc); Papandrea, *supra*, at 1090–92. A bare foreseeability standard could be stretched too far, and would risk ensnaring any off-campus expression that happened to discuss school-related matters. *See Thomas*, 607 F.2d at 1053 n.18.

---

[2] Assuming *arguendo* that *Tinker* did apply to students' out-of-school speech, I agree with the majority that the school district has failed to satisfy the substantial-disruption test.

In any event, this case does not require us to precisely define the boundary between on- and off-campus speech, since it is perfectly clear that J.S.'s speech took place off campus. J.S. created the Myspace profile at home on a Sunday evening; she did not send the profile to any school employees; and she had no reason to know that it would make its way onto campus. In fact, she took steps to limit dissemination of the profile, and the Myspace website is blocked on school computers. If ever speech occurred outside of the school setting, J.S.'s did so.

Having determined that J.S.'s speech took place off campus, I would apply ordinary First Amendment principles to determine whether it was protected. I agree with the majority that this was protected speech. The speech was not defamatory, obscene, or otherwise unprotected. *See Hustler Magazine*, 485 U.S. at 57; *Miller v. California*, 413 U.S. 15 (1973). J.S.'s suspension, then, violated the First Amendment.

\* \* \*

J.S. said vulgar, offensive things about her principal on Myspace. And she went beyond that. She wrote cutting, mean-spirited things about members of his family. If we could suppress her speech without silencing other, more deserving speakers, public discourse would suffer no harm. But courts have long disclaimed the ability to draw a principled distinction between "worthless" and "valuable" speech. We must tolerate thoughtless speech like J.S.'s in order to provide adequate breathing room for valuable, robust speech—the kind that enriches the marketplace of ideas, promotes self-government, and contributes to self-determination. Without condoning her disrespectful and

9

mean-spirited tone, I support J.S.'s right to say the things she said free from government punishment.

FISHER, *Circuit Judge*, dissenting, with whom SCIRICA, RENDELL, BARRY, JORDAN, and VANASKIE, *Circuit Judges*, join.

Today's holding severely undermines schools' authority to regulate students who "materially and substantially disrupt the work and discipline of the school." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969). While I agree with the majority's apparent adoption of the rule that off-campus student speech can rise to the level of a substantial disruption, I disagree with the Court's application of that rule to the facts of this case. The majority misconstrues the facts. In doing so, it allows a student to target a school official and his family with malicious and unfounded accusations about their character in vulgar, obscene, and personal language. I fear that our Court leaves schools defenseless to protect teachers and school officials against such attacks and powerless to discipline students for the consequences of their actions.

J.S., an eighth-grade student at Blue Mountain Middle School, was upset with her principal James McGonigle for disciplining her for dress-code violations, and she created a MySpace page in retaliation. At the URL http://www.myspace.com/kidsrockmybed, J.S. accused her principal of having sex in his office, "hitting on students and their parents," and being a "sex addict." She called him a "dick head," stated that he was "put on this world with a small dick," and called him a "fagass." She stated that his wife "looks like a man" and that his son "looks like a gorilla." She stated that the principal enjoys "riding the fraintrain," – a reference to his wife Debra Frain, who worked at the school

as a guidance counselor – and that "it's a slow ride but you'll get there eventually."

I respectfully dissent from the majority's ruling that the Blue Mountain School District's ten-day suspension of J.S. for making false accusations against McGonigle violated her First Amendment right to free speech. The majority holds that "[t]he facts in this case do not support the conclusion that a forecast of substantial disruption was reasonable." Maj. Op. at 15. But the majority makes light of the harmful effects of J.S.'s speech and the serious nature of allegations of sexual misconduct. Broadcasting a personal attack against a school official and his family online to the school community not only causes psychological harm to the targeted individuals but also undermines the authority of the school. It was permissible for the School District to discipline J.S. because substantial disruption was reasonably foreseeable.

I.

I disagree with the majority's assessment that the four opinions of the Supreme Court on student speech "compel the conclusion that the School District violated J.S.'s First Amendment free speech rights." Maj. Op. at 11. In fact, the Supreme Court has never addressed whether students have the right to make off-campus speech that targets school officials with malicious, obscene, and vulgar accusations. In *Tinker*, the Court examined whether a school had the authority to prevent students from wearing black arm bands on campus in protest of the Vietnam War. 393 U.S. 503. In *Bethel School District v. Fraser*, the Court held that a school could suspend a student for giving an obscene and vulgar

2

speech on campus at a school-sponsored event. 478 U.S. 675, 685 (1986). The Court in *Hazelwood School District v. Kuhlmeier* ruled that a school could exercise editorial control over the contents of a student newspaper so long as it was "reasonably related to legitimate pedagogical concerns." 484 U.S. 260, 273 (1988). And in *Morse v. Frederick*, the Court determined that a school could sanction a student for unfurling a banner that promoted illegal drug use at a school-approved event. 551 U.S. 393, 403 (2007). None of these decisions control the facts of this case nor do they compel a conclusion in favor of J.S.

The Supreme Court has only briefly and ambiguously considered whether schools have the authority to regulate student off-campus speech. *See* Emily Gold Waldman, *Badmouthing Authority: Hostile Speech About School Officials and the Limits of School Restrictions*, 19 Wm. & Mary Bill Rts. J. 591, 617-18 (2011). In *Tinker*, the Court stated that "conduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of rights of others is, of course, not immunized by constitutional guarantee of freedom of speech." 393 U.S. at 513. But it is unclear if "in class or out of it" means to distinguish the classroom from the world beyond the schoolhouse gates, or if it simply means out of class but in the cafeteria, schoolyard, or other areas on school grounds. Again, in *Kuhlmeier*, the Court stated that,

> We have . . . recognized that the First Amendment rights of students in the public schools "are not automatically coextensive with

3

the rights of adults in other settings," *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682[] (1986), and must be "applied in light of the special characteristics of the school environment." *Tinker*, []393 U.S.[] at 506[.] A school need not tolerate student speech that is inconsistent with its "basic educational mission," *Fraser*,[] 478 U.S.[] at 685,[] even though the government could not censor similar speech outside the school.

484 U.S. at 266. But the Court's meaning was left unclear. Either the Court meant to distinguish the school's authority to regulate student speech on campus from the school's authority to regulate off-campus speech, or the Court was simply contrasting the school's authority to regulate student speech with the government's authority to regulate adult speech. In *Morse*, the Court declined the opportunity to determine whether schools have the authority to regulate off-campus speech. Even though the student created the banner at issue off campus and was off school grounds when he unfurled it, the Court held that it was a school speech case because the banner was displayed at a school-approved event during normal school hours. *Morse*, 551 U.S. at 400-01. The Court, however, did state in dicta that schools have more limited authority to regulate obscene speech outside of the school environment when it claimed that "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected." *Id.* at 404 (citing *Cohen v. California*, 403 U.S. 15 (1971)). But the Court did not address the issue of whether schools can

regulate off-campus speech which causes substantial on-campus disruption under *Tinker*.

## II.

I believe that the rule adopted by the Supreme Court in *Tinker* should determine the outcome of this case. Under *Tinker,* we must examine whether J.S.'s speech created a significant threat of substantial disruption at the Middle School. School authorities need not wait until the disruption actually occurs if they are able to "demonstrate any facts which might reasonably have led [them] to forecast substantial disruption of or material interference with school activities." *Tinker*, 393 U.S. at 514. If the Middle School reasonably forecasted substantial disruption, then it had the authority to regulate J.S.'s speech. The majority seems to acknowledge just as much, but finds that "[t]he facts simply do not support the conclusion that the School District could have reasonably forecasted a substantial disruption of or material interference with the school as a result of J.S.'s profile." Maj. Op. at 21.

The majority reaches this conclusion by contrasting the facts of *Tinker* with those of our case. It notes that at the time of *Tinker* the United States had over 200,000 troops deployed in Vietnam and the country was divided over the issue. The majority cites the dissenting opinion of Justice Black who argued that the record demonstrated that the black arm bands worn by students in protest of the Vietnam War would distract students and disrupt the classroom. And yet, notes the majority, the Court in *Tinker* held that "'the record does not demonstrate *any facts* which might reasonably have led

5

school authorities to forecast substantial disruption of or material interference with school activities.'" Maj. Op. at 15 (emphasis in original) (quoting *Tinker*, 593 U.S. at 514). From a comparison with the facts of this case, the majority draws the conclusion that J.S.'s speech did not cause a substantial disruption at the Middle School nor was it reasonable to forecast a substantial disruption.

The majority is correct in finding it appropriate to distinguish the facts of *Tinker*, but it fails to heed several salient distinctions that compel the opposite conclusion. The speech in *Tinker* was political speech, was not directed at the school or at school officials, and was not vulgar, obscene, malicious, or harmful. Moreover, the majority misconstrues the facts of this case, making light of J.S.'s accusations and underestimating its impact.

A.

The speech at issue in *Tinker* did "not concern aggressive, disruptive action or even group demonstrations. . . . [It was] a silent, passive expression of opinion, unaccompanied by any disorder or disturbance." 393 U.S. at 508. The Court was concerned that peaceful and nonintrusive political speech was censored by the school. The Court was motivated by a fear of totalitarianism and the need to protect freedom of expression to preserve the foundations of a democratic system. What made the school's prohibition so troubling was that it appeared to be a content-based regulation of political speech. The school prohibited students from protesting the war, whereas other students were permitted to wear political buttons. Some even wore the Iron Cross, a

6

symbol traditionally associated with Nazism. "Clearly, the prohibition of expression of one particular opinion, at least without evidence that it is necessary to avoid material and substantial interference with schoolwork or discipline, is not constitutionally permissible." *Id*. at 511. A government entity regulating political speech that it did not agree with was eerily similar to that of totalitarian regimes. "In our system, state-operated schools may not be enclaves of totalitarianism. . . . [Students] may not be confined to the expression of those sentiments that are officially approved." *Id*.

In order to maintain a thriving democracy, students cannot be unreasonably encumbered in their freedom to express moral, political, and social ideals and beliefs. "'The classroom is peculiarly the "marketplace of ideas." The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth "out of a multitude of tongues, (rather) than through any kind of authoritative selection."'" *Id*. at 512 (quoting *Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967) (internal citations omitted)). Schools should foster an environment of learning that is vital to the functioning of a democratic system and the maturation of a civic body.

Allowing for the expression of beliefs and opinions in a robust but respectful environment encourages engagement, promotes self-improvement, and furthers the search for truth. The Court in *Tinker* embraced the freedom of speech as an essential component of the educational system. "When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions,

7

even on controversial subjects like the conflict in Vietnam, if he does so without 'materially and substantially interefer(ing) with the requirements of appropriate discipline in the operation of the school' and without colliding with the rights of others." *Id.* at 512-13 (alteration in original) (citation omitted).

B.

J.S., by contrast, targeted her principal and her principal's family with lewd, vulgar, and offensive speech. She created a MySpace page using a photograph of McGonigle that she had taken from the School District website, and she publicly disseminated numerous hurtful accusations. She accused McGonigle of sexual misconduct: "fucking in [his] office," "hitting on students and their parents," and being a "sex addict." She insulted McGonigle by calling him a "dick head," stating that he was "put on this world with a small dick," and calling him a "fagass." And J.S. insulted his family. She stated that his wife "looks like a man" and that his son "looks like a gorilla." She stated that the principal enjoys "riding the fraintrain" and that "it's a slow ride but you'll get there eventually."

The School found this speech to be in violation of school policy because J.S. made "false accusations about the school principal" and violated copyright law in using McGonigle's picture. App. A70. This constituted a level IV infraction because it involved "making a false accusation about a school staff member," *id.* A66, and the School imposed a ten-day suspension.

J.S.'s speech is not the type of speech that the *Tinker* Court so vehemently protected. I agree with the majority that the facts in the record fail to demonstrate substantial disruption at the School. But the profile's *potential* to cause disruption was reasonably foreseeable, and that is sufficient.[1] *Tinker*, 393 U.S. at 514. Two forms of disruption were foreseeable. First, the MySpace page posed a reasonably foreseeable threat of interference with the educational environment. If J.S.'s speech went unpunished, it would undermine McGonigle's authority and disrupt the educational process. Second, J.S.'s speech posed a reasonably foreseeable threat of disrupting the operations of the

---

[1] Today, our Court releases a separate opinion dealing with school discipline of a student who created a MySpace profile of his principal. *See Layshock v. Hermitage Sch. Dist.,* -- F.3d -- (3d Cir. 2011) (en banc). However, I find the two cases distinguishable. Unlike the instant case, the school district in *Layshock* did not argue on appeal that there was, under *Tinker,* a nexus between the student's speech and a substantial disruption of the school environment. *Id.* at Part IV.2. This nexus, under *Tinker,* is the basis of my dissent in this case. The Court in *Layshock* also holds, under *Fraser*, that the student's speech could not be considered "on-campus" speech just because it was targeted at the Principal and other members of the school community and it was reasonably foreseeable that school district and Principal would learn about the MySpace profile. *Id.* at Part IV.3. *Layshock*'s holding, therefore, does not speak to the facts of this case to which I believe *Tinker* applies.

9

classroom. It was foreseeable that J.S.'s false accusations and malicious comments would disrupt McGonigle and Frain's ability to perform their jobs. I handle both forms of disruption in turn. Finally, I discuss how the majority misconstrues the facts to underestimate the foreseeable impact of J.S.'s speech.

1.

J.S.'s speech posed a threat of substantial disruption to the educational environment. The majority fails to recognize the effects of accusations of sexual misconduct. J.S. created the profile at the URL ending in: "kidsrockmybed." She accused McGonigle of having sex in his office, "hitting on students and their parents," and being a "sex addict." The profile stated that "I love children[ and] sex (any kind)."

Such accusations interfere with the educational process by undermining the authority of school officials to perform their jobs. In a case where a student referred to his assistant principal as a "dick," the district court noted:

> Insubordinate speech always interrupts the educational process because it is contrary to principles of civility and respect that are fundamental to a public school education. Failing to take action in response to such conduct would not only encourage the offending student to repeat the conduct, but also would serve to foster an attitude of disrespect towards teachers and staff.

10

*Posthumus v. Bd. of Educ. of the Mona Shores Pub. Sch.*, 380 F. Supp. 2d 891, 902 (W.D. Mich. 2005). J.S. did not only refer to her principal as a "dick" but launched a vulgar attack on his character and accused him of sexual misconduct. J.S. embarrassed, belittled, and possibly defamed McGonigle. If J.S. were not disciplined, it would demonstrate to the student body that this form of speech is acceptable behavior – whether on or off campus.

Further, accusing school officials of sexual misconduct poses a foreseeable threat of diverting school resources required to correct the misinformation and remedy confusion. It was reasonably foreseeable that the accusations made in the MySpace profile would be shared with parents and teachers. McGonigle's character would come under investigation, and his fitness to occupy a position of trust with adolescent children would be questioned. It is inevitable that as more students and parents learned of the profile, the School would experience disruption. While Superintendent Joyce Romberger may have dismissed the accusations as false because she knew him,[2] students and parents unfamiliar with McGonigle may have had serious questions about McGonigle's character and actions. Parents would become concerned that their children were supervised by a man accused of having sex in his office, being a "sex addict," and "hitting on" their children. It was reasonably foreseeable that

---

[2] Romberger stated that she did not disclose any of the allegations in the profile because she believed it consisted of "lies" and "malicious comments" made by students angry at McGonigle.

11

school administrators would have to spend a substantial amount of time alleviating these concerns. The Middle School acted reasonably in requesting the removal of the MySpace page, contacting J.S.'s parents, and suspending J.S. for ten days. If such steps were not taken, it is likely that the Middle School would have suffered substantial disruptions because McGonigle's authority would have been severely undermined and school resources would have been diverted to alleviate the inevitable concerns.

2.

The majority also overlooks the substantial disruptions to the classroom environment that follow from personal and harmful attacks on educators and school officials. J.S.'s speech attacked McGonigle and Frain in personal and vulgar terms and broadcasted it to the school community. This kind

of harassment has tangible effects on educators.[3] It may cause teachers to leave the school and stop teaching altogether, and those who decide to stay are oftentimes less effective. *See* Jina S. Yoon, *Teacher Characteristics as Predictors of Teacher-Student Relationships: Stress, Negative Affect, and Self-Efficacy*, 30 Soc. Behav. & Personality 485,

---

[3] It is worth noting that these forms of online personal attacks by students occur with some degree of frequency. They are often directed at other students and have been called "cyberbullying." In a 2010 study, 20.8 percent of students ages 10 to 18 years old stated that they had been "cyberbullied" in their lifetime, and 7.5 percent stated that they were "cyberbullied" within the previous 30 days, where "cyberbullying" was defined as "when someone repeatedly harasses, mistreats, or makes fun of another person online or while using cell phones or other electronic devices." Sameer Hinduja & Justin W. Patchin, Cyberbullying Research Center, available at http://www.cyberbullying.us/research.php. In a different study from 2007 – perhaps reflecting the nebulous concept of "cyberbullying" – 7 percent of students stated that they had been victims of "self-defined cyberbullying." National School Board Association, *Creating & Connecting: Research and Guidelines on Online Social – And Educational – Networking* 6 (2007); *see also* M.I. Ybarra & J.K. Mitchell, *Online Aggressor/Targets, Aggressors and Targets: A Comparison of Associated Youth Characteristics*, 45 J. Child Psychol. & Psychiatry 1308 (2004) (19 percent of youth were on the giving or receiving end of online aggression in the previous year).

13

491 (2002) ("Not only does teacher stress affect teachers' general attitude toward teaching, but also it is likely to influence the quality of their relationships with students."); Suzanne Tochterman & Fred Barnes, *Sexual Harassment in the Classroom: Teachers as Targets*, 7 Reclaiming Child & Youth 21, 22 (1998) (noting that educators who are subject to sexual harassment feel: "detachment; shame; horror; uncertainty; demoralization; fear; feelings of being unappreciated, targeted, objectified, belittled, and victimized; sadness; anger; avoidance; feeling defeated; blame; separation; and attack"). Educators become anxious and depressed and feel unable to relate to their students. *Id.* They lose their motivation to teach, and their students suffer as a result. "Even if the school official remains at the school, 'anxious, depressed or disengaged teachers are less able to sustain the academic engagement of their students,' thus harming student motivation and behavior." Waldman, *supra* at 646 (quoting Benoit Galand, et al., *School Violence and Teacher Professional Disengagement*, 77 Brit. J. of Educ. Psychol. 465, 467 (2007)).

These studies are consistent with cases involving hostile, vulgar, and obscene student speech directed at school officials. In *Wisniewski v. Board of Education of Weedsport Central School District*, the Second Circuit noted that a teacher who was subjected to hostile student speech became distressed and had to stop teaching the student's class. 494 F.3d 34, 35-36 (2d Cir. 2007). Similarly, in *J.S. v. Bethlehem Area School District*, the teacher,

> suffered stress, anxiety, loss of appetite, loss of sleep, loss of weight, and a general sense of loss

14

> of well being as a result of viewing the [hostile and offensive student] web site. She suffered from short-term memory loss and an inability to go out of the house and mingle with crowds. [The teacher] suffered headaches and was required to take anti-anxiety/anti-depressant medication.

807 A.2d 847, 852 (Pa. 2002). The teacher was unable to return to school, and the "web site had a demoralizing impact on the school community." *Id.* In *Schroeder v. Hamilton School District*, a teacher was subjected to anti-homosexual speech from students and parents and suffered a "nervous breakdown that ultimately resulted in his termination." 282 F.3d 946, 950 (7th Cir. 2002). In our case, McGonigle stated that he became distressed after viewing J.S.'s MySpace profile. He stated, "I was very upset and very angry, hurt, and I can't understand why [J.S.] did this to me and my family." App. A333.

J.S.'s speech had a reasonably foreseeable effect on the classroom environment. In addition to causing a diminution in respect for authority and a diversion of school resources, J.S.'s speech posed reasonably foreseeable psychological harm to McGonigle and Frain that would impact their ability to perform their jobs. Being subject to such personal attacks, they may have been discouraged to interact with students and perhaps even motivated to leave without the institutional support of the School. Without effective punishment, McGonigle and Frain would have been less effective in fulfilling the educational mission of their positions. Furthermore, if the Middle School did not punish

15

J.S., it was foreseeable that other students may have decided to personally attack McGonigle, Frain, or other members of the school. *Cf. Morse*, 551 U.S. at 409-10 (noting the "difficult" and "vitally important" role that school principals play and reasoning that "failing to act would send a powerful message to the students" in affirming school's 10-day suspension of student for speech promoting illegal drug use). The Middle School protected its employees against such a vicious and personal attack, thereby preventing substantial disruption of the classroom environment. I believe our Court errs in precluding schools from protecting teachers and officials against such harassment.

3.

I question the majority's assessment of the facts of this case.[4] Its conclusion that a substantial disruption was not

---

[4] My disagreement with the majority is principally with respect to its interpretation of the facts. I am not in disagreement with the majority's assumption that *Tinker* applies to off-campus speech. We simply disagree about whether J.S.'s speech rises to the level of a substantial disruption. By sharp contrast, the concurring opinion by Judge Smith embraces the position that *Tinker* does not apply to off-campus speech. The concurring judges state that off-campus student speech should receive the same protections as adult speech "in the community at large." Conc. Op. at 1. While certainly a defensible position, I find it unpersuasive. Student speech that targets school officials, is publicly broadcasted to the school community, and has a reasonably foreseeable substantial disruption on the classroom

reasonably foreseeable rests on several mischaracterizations: that J.S.'s MySpace profile should be regarded as a "joke"; that her profile should not have been taken seriously; that because J.S. did not identify McGonigle by name, it lessened the impact of her profile; and that J.S. took steps to ensure that her profile remained private and did not reach the school. Each of these findings is flawed.

First, the majority makes light of J.S.'s post, characterizing it as a "joke" that, while "indisputably vulgar," was "juvenile and nonsensical." Maj. Op. at 17. The majority goes so far as to state that we should take J.S.'s speech less seriously because she intended it as a "joke." *See id*. This is not the test adopted by *Tinker*. The intent of the

---

environment is regulable by schools, whether it occurs on- or off-campus. The regulation of J.S.'s speech was grounded in "the special characteristics of the school environment," *Tinker*, 393 U.S. at 506, because it served the purposes of preserving the authority and respect of school officials, averting the need to utilize school resources to correct misinformation and remedy confusion, and protecting school officials against the psychological effects of student harassment. The concurring judges advocate for an artificial distinction that belies the fact that off-campus student speech can have a very real impact on the classroom environment.

17

speaker is of no consequence.[5]   What determines the permissibility of the School's response under the First Amendment is whether it was reasonable to foresee substantial disruption.

Moreover, it is not our role to determine how schools should treat accusations of sexual misconduct and personal attacks on school officials. School administrators, not judges, are best positioned to assess the potential for harm in cases like this one, and we should be loath to substitute our judgments for theirs. *See Morse*, 551 U.S. at 427 (Breyer, J., concurring in part and dissenting in part) (warning against the dangers of interfering "with reasonable school efforts to maintain discipline"); *cf. Fraser*, 478 U.S. at 683 ("The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board."). Thus, even if J.S.'s post can be treated as a juvenile joke, it does not mean that the School District had to treat it as such. For it is also eminently reasonable to treat accusations of sexual misconduct seriously. I believe our Court errs when it tells a school district how it should handle

---

[5] Even if J.S.'s intent were at issue, it is not so clear that the profile was intended to be a joke. While she at one point stated that the profile was created for comical reasons, J.S. also stated that she created the profile because she was "mad" at McGonigle for disciplining her. She claimed that McGonigle unnecessarily yelled at her for committing dress code violations. It is therefore fair to say that J.S. created the profile in retaliation.

18

violations of its policy that are of as serious and grave a matter as false accusations of sexual misconduct.[6]

The majority also draws conclusions from the fact that Superintendent Romberger had a duty to report allegations of misconduct and did not do so in this particular case. But the fact that Superintendent Romberger chose not to report the misconduct does not mean that it should not have been reported. Moreover, other schools who face this situation may properly choose to report allegations of misconduct. Our Court does a disservice when it treats allegations of sexual misconduct lightly and condones school districts for not taking action. The majority claims that no one could take the contents of J.S.'s post seriously. *Id.* But stating that the principal of a middle school has sex in his office and is a "sex

---

[6] Similarly, even though the majority might have reached a different conclusion on these facts, it certainly cannot be said that the School District acted *unreasonably* by suspending J.S. for ten days. *Cf. Morse*, 551 U.S. at 398, 409-10 (affirming ten-day suspension of student who displayed a banner encouraging illegal drug use at a school event). Indeed, the reasonableness of the School District's response to J.S.'s behavior further distinguishes this case from *Layshock*, where, in addition to being suspended for ten days, the student was (1) transferred to a special academic program for "students with behavior and attendance problems who are unable to function in a regular classroom," (2) banned from all extracurricular activities, and (3) prohibited from participating in his graduation ceremony. *See Layshock*, Part I & n.6.

addict" who enjoys "hitting on children and their parents" are serious allegations that cannot be taken lightly by any school official or by our Court.

The majority states that the profile did not identify McGonigle by name, school, or location. Maj. Op. 22. But this in no way lessens the gravity of harm. The profile identified McGonigle by posting his picture. There are no facts in the record demonstrating that anyone was at a loss as to who the profile was about.

The majority claims that J.S. did not intend for her accusations to reach the school. Maj. Op. at 17. Even if this is true, it is an unreasonable expectation that should not carry weight in our analysis. J.S. created a profile on a social networking site using McGonigle's photograph, accused him of sexual misconduct, insulted his family members, and used exceptionally vulgar and obscene language. She then made the profile public and shared it with classmates. It was only a matter of time before the subject of her attack found out. And he did, two days later. The majority claims that J.S. "took specific steps to make the profile 'private' so that only her friends could access it." Maj. Op. at 20. But there is another way to read this. After hearing from her fellow students about the buzz her profile had created, she made it "private," but then continued to send the profile to her classmates, sharing it with twenty-two students. J.S. evinced an expectation that she could somehow share the profile amongst members of the school without the subject of her vehement attack finding out. The majority embraces this unreasonable expectation.

20

The majority also finds that the School District was barred by state law from punishing J.S. for off-campus speech. Maj. Op. at 17 n.5. Pennsylvania law states that a School District has the authority to:

> adopt and enforce such reasonable rules and regulations as it may deem necessary and proper, regarding the management of its school affairs . . . as well as regarding the conduct and deportment of all pupils attending the public schools in the district, during such time as they are under the supervision of the board of school directors and teachers, including the time necessarily spent in coming to and returning from school.

24 Pa. Const. Stat. § 5-510. The majority relies on *D.O.F. v. Lewisburg Area School District Board of School Directors*, 868 A.2d 28 (Pa. Commw. Ct. 2004), for the proposition that schools lack the authority to regulate conduct that occurs outside of school during non-school hours. But this case is unrelated to the case before us. It involves a student's use of drugs during non-school hours that had no effect on the school. Here, by contrast, a student directed speech about the school at members of the school and had a foreseeable impact on the operations of the classroom. McGonigle punished J.S. "to prevent interference with the educational process," which the Pennsylvania Commonwealth Court has explicitly held is authorized under § 5-510. *See D.O.F.,* 868 A.2d at 36; *see also Bethlehem Area Sch. Dist.*, 807 A.2d at 852 (holding that a school district's punishment of a student for creating a website at home during non-school hours was permissible).

21

Accordingly, I do not believe the statute excludes school regulation of out-of-school conduct that threatens to materially interfere with the educational process.[7] Because the profile created a reasonably foreseeable substantial disruption of the Middle School, the School District did not exceed its statutory authority in punishing J.S.

## C.

Our decision today causes a split with the Second Circuit. In applying *Tinker*, the Second Circuit has held that off-campus hostile and offensive student internet speech that is directed at school officials results in a substantial disruption of the classroom environment. In *Wisniewski*, a middle school student sent messages to fifteen fellow students via an instant messenger program from his home computer during non-school hours. 494 F.3d at 35-36. The program used an icon depicting one of his teachers being shot in the head with text below reading "Kill Mr. VanderMolen." *Id.* The Second Circuit stated that "off-campus conduct can create a foreseeable risk of substantial disruption within a school," *id.* at 39 (citing *Thomas v. Board of Education,* 607 F.2d 1043, 1052 n.17 (2d Cir. 1979)), and held that it was reasonably foreseeable that the depiction would come to the attention of school authorities and the teacher who was the subject of the drawing. *Id*. at 39-40. The court reasoned that:

---

[7] I also believe it is improper to read § 5-510 as an exhaustive description of all occasions under which school officials are statutorily authorized to punish students for infractions of school policies.

> The potentially threatening content of the icon and the extensive distribution of it, which encompassed 15 recipients, including some of Aaron's classmates, during a three-week circulation period, made this risk at least foreseeable to a reasonable person, if not inevitable. And there can be no doubt that the icon, once made known to the teacher and other school officials, would foreseeably create a risk of substantial disruption within the school environment.

*Id.* The Second Circuit held that hostile and offensive off-campus student speech posed a reasonably foreseeable threat of substantial disruption within the school. *Id.*

The Second Circuit confronted a similar scenario in *Doninger v. Niehoff*, 527 F.3d 41 (2d Cir. 2008) (*Doninger* I) and *Doninger v. Niehoff*, -- F.3d --, 2011 WL 1532289 (2d Cir. April 25, 2011) (*Doninger* II). A member of the high school student council, upset by scheduling conflicts regarding a student event, posted a message on her blog from her home computer during non-school hours. She stated that the student event was "cancelled due to douchebags in the central office." *Doninger* I, 527 F.3d at 45. She urged people to call or write a school official "to piss her off more." *Id.* The school received numerous calls and emails, some of which were from students who were upset. As a result of the blog post, the school refused to allow the student to run for Junior Class Secretary. The student challenged the school's sanction, but the Second Circuit stated that the student's post, "although created off-campus, was purposely designed by

23

[the student] to come onto the campus." *Doninger* I, 527 F.3d at 50. The Court reasoned that her post "foreseeably create[d] a risk of substantial disruption within the school environment." *Id.* at 50. It was reasonably foreseeable that "administrators and teachers would be further diverted from their core educational responsibilities by the need to dissipate misguided anger or confusion over [the student event's] purported cancellation." *Id.* at 51-52.

The majority claims that these cases are distinguishable. It argues that no one could have taken J.S.'s accusations seriously and that "J.S. did not even intend for the speech to reach the school." Maj. Op. at 20. The majority misses the mark. As discussed above, J.S.'s post was at least potentially psychologically harmful to McGonigle and Frain, it was vicious in its accusations of sexual misconduct, and it posed the potential to undermine McGonigle's authority at the Middle School and to divert School resources in tempering the inevitable anger and confusion amongst parents and the community following a public accusation of sexual misconduct. It is of no consequence if J.S. in fact did not intend to reach the Middle School. She directed obscene and harmful speech at McGonigle and his family, disseminated it to members of the School, and made unfounded accusations. For these reasons, it was reasonably foreseeable that her speech would cause a substantial disruption of the educational process and the classroom environment. And it is on this point that the majority parts ways with the Second Circuit.

\*       \*       \*

24

The majority's approach does not offer a promising way forward. Internet use among teenagers is nearly universal. *See* Amanda Lenhart, et al., Pew Internet & American Life Project: Teens and Social Media 2 (2007) (stating that 93 percent of teenagers use the internet and 61 percent use it daily). And social networking sites have become one of the main vehicles of social interaction. *See* Amanda Lenhart, et al., Pew Internet and American Life: Teens and Mobile Phones 59 (2010) (stating that 73 percent of teenagers use a social networking site); National School Board Association, Creating & Connecting: Research and Guidelines on Online Social – And Educational – Networking (2007) (stating that teenagers spend an average of 9 hours per week on social networking sites).

The line between "on-campus" and "off-campus" speech is not as clear as it once was. Today, students commonly carry cell phones with internet capabilities onto school grounds. Approximately 66 percent of students receive a cell phone before the age of 14, and slightly less than 75 percent of high school students have cell phones. Amanda Lenhart, et al., Pew Internet and American Life: Teens and Mobile Phones 9 (2010). Twenty-three percent of teenagers between the ages of 12 and 17 who own cell phones use them to access social networking sites like MySpace and Facebook. *Id.* at 56. The majority embraces a notion that student hostile and offensive online speech directed at school officials will not reach the school. But with near-constant student access to social networking sites on and off campus, when offensive and malicious speech is directed at school officials and disseminated online to the student body, it is

reasonable to anticipate an impact on the classroom environment. I fear that our Court has adopted a rule that will prove untenable.

IV.

I concur in the Court's decision that the School District did not violate J.S.'s parents' rights under the Fourteenth Amendment to raise their child in the manner which they saw fit as discussed in Part IV of the majority opinion, and I concur in the decision that the School District's policies were not unconstitutionally overbroad and vague as discussed in Part V of the majority opinion.

But I respectfully dissent from the decision that the suspension of J.S. for making false and malicious accusations against her principal in the form of lewd and offensive speech violated her First Amendment rights. In student free speech cases, courts must grapple with the issue of promoting freedom of expression while maintaining a conducive learning environment. I believe the majority has unwisely tipped the balance struck by *Tinker*, *Fraser*, *Kuhlmeier*, and *Morse*, thereby jeopardizing schools' ability to maintain an orderly learning environment while protecting teachers and school officials against harmful attacks.